May it please the Court, Michelle Hill for appellant, Margaret Branscomb, I'd like to reserve two minutes for rebuttal for co-counsel. There are seven issues that are presented here, and with the Court's indulgence, I would like to present each issue just before making my argument. I think if you would just raise the mic just a little, that would be helpful. Is that better? Yes. Just keep your voice up, because Judge Hugg also has to hear you. Okay. Okay? With the seven issues, with the Court's indulgence, I would like to address them each time I assert that issue. The sole purpose of a motion for summary judgment is to determine whether or not there are tribal issues. If there are tribal issues, the motion must be denied. In the lower court, Judge Tilburg stated that in regard to the issue of performance, he found that it was questionable. What that means is that there is a tribal issue to the very issue for her termination. Group USA indicated that they terminated plaintiff for poor performance. They submitted for evidence the affidavit of Patricia Miller. And the issue in regard to Ms. Miller's affidavit is that the Court improperly did the Court err, abuse its discretion, excuse me, in considering the information contained in Ms. Miller's affidavit. And the answer is yes. Ms. Miller's affidavit is based upon hearsay and shows that she lacks personal knowledge and is being submitted to show that there was poor performance. I don't think it was, the judge didn't treat it that way as I understood the record. That is, he didn't use it to, as a basis for concluding that there was poor performance. The information we relied upon to explain why she took the action that she did. There's a difference. In regard to why she took the action that she did, her declaration itself establishes a contradiction with the records that they submit. And so, therefore, before you can make, I guess what would be considered a state of mind matter to determine whether or not the information should be submitted, you have to look at whether or not Ms. Miller's decision-making process was in good faith. She herself indicated in her affidavit that she made a determination to terminate her on August 28th based on the review of three different dresses that she looked at that she stated were performed by Ms. Branscombe. But their own records indicate that she saw those dresses on July 16th, and that was the basis for the probation. Between July 16th and August 28th, there were no violations of the probation. Ms. Branscombe didn't engage in any poor performance issues, nor was she late during that period of time. So when you're making an assessment in regard to whether or not the decision was simply based on Ms. Branscombe, and that evidence, and in good faith, it's still a matter that must go to the jury to determine the credibility of her bad faith. In fact, Group USA submitted two cases, and one of them is Oshkosh, which that matter was before the jury, and there was a determination as to whether there was bad faith. Also, there was Yee, which the court states that when you're dealing with discriminatory intent, you should not use that word. It's a matter for the fact finder. So the trial court erred in submitting or using the information contained in Ms. Mueller's affidavit, which leads me to the next issue. Did the trial court err or abuse its discretion in finding that Group USA met its burden of determining whether or not there was a triable issue, the lack of a triable issue of fact? And they did not, because the evidence that they submitted to establish that there was poor performance is inadmissible hearsay. It contradicts itself. When we look at the evidence, Ms. Branscombe disclosed that she needed medical attention for a tumor that she received. Shortly after that, she submitted, excuse me, Group USA started stating that she had poor performance, stating that she was... There were, weren't there some performance issues before she left for her medical concerns? They stated that there were issues concerning her performance before she left. Group USA has a policy that states that if a patient has a performance issue, that they don't even grant leave to anyone who is not in good standing. They did a write-up in March, which there is some issues in regard to what transpired there, because first they said there were performance issues in regard to February. They contend that they didn't have time because she was so busy, and they couldn't talk to her prior to March 8th. But they did not have time to talk to her prior to March 8th. And one of the complaints was that she had low productivity. So that's inconsistent with the fact that she's not performing properly. In any event, she goes on her medical leave and then comes back half-time. She goes on her medical leave and comes back half-time. And... Could you just spell out for me what the material issues that are inconsistent and need to be tried out, rather than the basis of summary judgment? Okay. The material issues are, it is Group USA's contention that she was terminated for poor performance. Ms. Branscombe has said that her performance was not poor. In fact, she had several declarations that stated that they liked her work. She had a declaration by a co-worker who is a percipient witness who viewed her work, viewed the interactions between Ms. Branscombe and Group USA management, and had saw firsthand the way they were treating her. That's Ms. Williams? That's Ms. Williams. And she, Group USA hired her as a bridal consultant. And she fully understood what was happening, and she even indicated that the manager stated that we are trying to get rid of Ms. Branscombe. Now, if you need to let somebody go for poor performance, you don't try to get rid of them. You simply let them go. But if you want to get rid of someone for discriminatory reasons, then you get rid of them. And that's a matter that's for the jury to determine the credibility between what Group USA is saying the basis for the termination. Which was the manager that said we want to get rid of her? Claudia Borges. And also, at their first instance, when they indicate that, or have the opportunity to get rid of Ms. Branscombe, they submitted a document to the Department of Economic Security stating that their records reveal that Ms. Branscombe voluntarily quit. They submitted a document in response to Ms. Branscombe's claim for unemployment benefits that their records reveal that Ms. Branscombe voluntarily quit. And so those records that are in the file are not the same as the records that they contend support the basis for the termination. Those documents that they complain consist of complaints, do not have any dates, they're written by several different people, no one set the foundation for the records. And also they consist of hearsay. And there's a weighing that's required, and when the court says that that's insufficient, because it's not specific, that also goes towards weighing the evidence, which is a matter for the fact finder. They themselves create a triable issue by the inconsistencies in their own declaration and the documents. And also by the earliest opportunity with the DES document to state the reason for her termination. Also what shows a triable issue is the management primarily spoke Spanish, and they hired someone who only spoke Spanish. And what Ms. Branscombe indicated is they started treating her different and doing different things to her dresses when she wasn't present. And then what they came back and said is that there is a problem with this work, but when she submitted a complaint in response to their accusations that she wasn't performing accurately, they willfully ignored that complaint. And they indicated that this, you know, in their response was that she didn't state she was discriminated against, but in her complaint she said I'm being treated unfair. That's what discrimination is, is unfair treatment. So there are triable issues as to whether or not poor performance was the reason for the termination. And sufficient evidence has been submitted to show their lack of credence to their business reason for the termination. Isn't it rather significant that in Ms. Branscombe's deposition she said that she did not think this had anything to do with her race, that it was just a disagreement about work performance? It's not. That was in her deposition based on the question that was asked. But during the time that the incidents were occurring, they were treating her different, speaking Spanish in front of her, and then also they hired a Spanish-speaking person. Well, but she's saying actually in her deposition that she didn't think it had anything to do with race, that it was a disagreement about performance. How does she get around that? Well, in regard to the question that was posed, she was talking about the performance issues when they stated she felt like it was a disagreement about work performance during the deposition. Well, I don't know if you happen to have the question that was asked, but I can't imagine what question would be asked that would change what she said there. At the time that the incidents were occurring during the work in February, the deposition was taken a year later. Well, it was taken a year later, but she just said it didn't have anything to do with her race. She, but that's just one of the issues here as well. There's also her age and also the disability issue. Yeah. Okay. Did you want to save those two minutes for your counsel for rebuttal? Yes, I do. Good morning, Your Honors. May it please the Court, my name is Lawrence Rosenfeld, appearing on behalf of Group USA. Your Honor, summary judgment was appropriately granted to Group USA in this case through proper application of the McDonnell-Douglas burden-shifting paradigm. While the district court expressed uncertainty as to whether under that three-step construct appellant's evidentiary showing passed muster at the incipient prima facie case stage, it nonetheless, for purposes of considering the summary judgment motion, assumed that that initial burden had been satisfied by appellant as to all claims other than the ADA. Of course, I can tell that appeared to have been a correct assumption. Yes, debatable, but arguably correct. And frankly, when counsel says that because the trial judge expressed doubt that plaintiff, that appellant had satisfied her prima facie case, and therefore there must be a fact issue, that kind of stands what the trial judge was saying on its head. He was expressing doubt that there was even enough evidence mustered to make a prima facie case. But we've made it pretty clear it only takes a minimal amount of evidence to establish a prima facie case. And that's why we indulge that. Why isn't there a tribal issue of fact at step three? That is, why isn't there a tribal issue of fact over pretext? Well, we can take these one by one. Let's begin with the notion that we have the same actor inference here, Your Honor. A same actor inference. Ms. Patricia Miller, who hired the appellant as a 68-year-old African-American woman, is also a decision-maker with respect to her termination. Was she the sole decision-maker with respect to her termination? That's correct, Your Honor. Well, was her reason for firing based on statements made to her by the managers on the front? There were three sources of information that Ms. Miller relied on. The first were her own inspections. There were two sources of information that Ms. Miller relied on. The appellant misspoke when she said that the termination in August was based on the same three dresses that Ms. Miller had expressed concern about during her July visit. In fact, her deposition testimony, and we cite to this in our brief, her deposition testimony was clear that she looked at different dresses in August than she did in July. So one source of information was that the sole decision-maker eyeballed on two occasions in July when she put appellant on the same three dresses. And when the appellant noticed that her work was unsatisfactory, that was the first occasion on which she determined that the work was not up to par. And then she came back in August, looked at different dresses, and concluded there had not been sufficient improvement, terminated her. Was there, I guess we'll wait for the, was there a contention that the three dresses were altered for the inspection? There was at most, at most speculation. There was no evidentiary showing that that was even a remote possibility. And I would suggest that it was the appellant's burden to come forward with some sort of evidence that the dresses were altered. It's very similar, Your Honor, to the argument that was made in the trial court by appellant where she said, well, how do we even know those dresses were mine? Well, as a matter of fact, Ms. Miller testified and set forth in her declaration that she actually showed the appellant the dresses. And that would have been a perfect opportunity for the appellant to say, these don't look like dresses I altered. She didn't say that. So all of this is highly speculative, not supported by any evidence of record. So, so, Maude, you just pointed out she looked at the dress, she considered the dresses herself. She eyeballed the dresses. That's correct. What other information did she rely upon to make the decision to terminate her? There was ample written documentation of customer complaints. That was in the personnel file as well. These were not tied to any particular customer, is that right? When you say, was the customer identifiable, is that your question? Yes. Yes, absolutely. Because they were written on the actual alteration receipt. When alterations are done, as the record establishes, there is a document prepared so that the seamstress knows specifically what work needs to be done. And I would hesitate to get caught up in the technicalities. This is not my field of expertise. But, you know, if it's a hem or a bustle or a gusset, I actually learned a little bit during this case, that's noted on the alteration receipt. And there is an opportunity, then, for a notation to be made as to whether the customer was happy, unhappy, treated appropriately, et cetera. And the customer's name is on that alteration receipt. So, yes, it is directly attributable to a particular individual. Now, Ms. Williams, I think, thought that or testified that there were more complaints about Maria's work than about Branscom's. She didn't testify there were more complaints. She said one-third of the customers preferred Ms. Branscom to Ms. Flores because Ms. Branscom spoke English, and purportedly Ms. Flores did not, although Ms. Flores was not deposed. And the notion that she spoke no English is really not borne out by this record. Even if she spoke no English, I think there would be a legal concern if we were standing here today suggesting that we terminated or the company terminated Ms. Flores because she wasn't bilingual and the company would certainly not take that position and didn't weigh her English-speaking abilities when it made its decision or when it was evaluating Appellant's work. I mean, it made no comparative assessment as between Ms. Flores and Ms. Branscom. That wasn't the issue. The issue was Ms. Branscom's work standing alone was not satisfactory. And the third, to finish my response, Judge Fletcher, to your question, the third source of information was from co-workers who suggested that her interactions with customers were not always appropriate. So there were three sources of information that were relied upon. Now, is there any evidence in the record to reflect that those co-workers who spoke with Ms. Miller, wanted to get rid of Ms. Branscom, preferring to have maybe a Spanish-speaking seamstress? There's certainly no evidence of that. I mean, Ms. Williams, in fact, was asked at her deposition whether she felt that any employment decision made with respect to Ms. Branscom was based on race, and she said no. She had no evidence of that whatsoever. Similar to, as Judge Hugg pointed out, when Ms. Branscom was asked that precise same question and she gave the precise same answer, no, she had no evidence or did not believe that the assessment of her performance had anything to do with her race. I think those are pretty definitive responses. And while it might be the case, at least there's testimony in the record that a comment was made by Ms. Barquez that she wanted to replace Ms. Branscom. Well, according to counsel's representation, she said, I want to get rid of her. Well, and let's assume those are the words used. I think it's hair-splitting to say, well, if she was performing poorly, you wouldn't say get rid of. You'd say replace, or I'm not exactly sure what the words were that counsel was suggesting should have been used. There certainly could be a desire to get rid of someone who is not performing up to par. People who have race discrimination claims or age discrimination claims, and you ask them, do you think this was based on race? Do you know what happened? They may not understand fully what that means. Well, the question, and it's in the record, the question was very straightforward and simple. It wasn't legalistic. Do you think race played any part in your determination? Did they ask her that? They asked whether there was any, whether she believed that the disagreement she had with Ms. Miller about her performance was based in any way on her race, and she said no. Well, you know, maybe performance and race is one thing, but whether she was terminated because of her race might well be another question. It certainly, I guess, in a theoretical way, could be another question. Why in a theoretical way? Why not in a practical way? Because there's no evidence in this record, Your Honor, to support that that's what happened here. The same, if we look, take a look, for example, at the Coughlin case and the Bradley case, both in this circuit. Those cases talk about the same actor inference, which, by the way, is not even mentioned in either of the briefs filed in this Court by appellate, which I find somewhat surprising, or maybe not so much so, because the Coughlin and the Bradley cases make clear that a plaintiff's burden is, quote, especially steep when the same person who hired the individual terminated that individual. And it talks about a party having to, quote, muster an extraordinarily strong showing of discrimination to defeat the articulated reason for termination. I'm sorry, Your Honor. If Ms. Miller was relying on the statements of the managers at the shop who did have discriminatory purposes but she herself did not, isn't that enough? So we should be looking at what the people who told Ms. Miller that they wanted her fired because her work was not up to par or she didn't get along with clients or customers. It seems to me that we could have a case of discrimination. Miller hired and Miller fired, but the other people were the ones that caused the firing because of their discriminatory intent. Several responses to that, Your Honor. Well, this is just a legal proposition. Yes. That can be the case. Is that not so? That is absolutely so. There is the cat's paw theory of liability. I would suggest that there's no substantial showing of that. That may be, but I am just asking you as a matter of law. You are correct, Your Honor. Okay. And you don't need to go further in your response. The one thing, if I may, though, since, Your Honor, you've inquired as to that, the cases that appellants cited and cat's paw was not argued as such in the trial court, but putting that aside, the cases that were cited by appellant are really very distinguishable from our case. The case that I think is the most illustrative of that fact is the, I think it's the Block case, where the alleged cat's paw, number one, had himself made several discriminatory remarks about women and about blacks in the workplace. Number two, that, quote, cat's paw in the Block case admitted he was involved in the decision-making. And number three, there was no evidence in the Block case that the ultimate decision-maker, as Ms. Miller was here, that in the Block case, the ultimate decision-maker actually had firsthand knowledge through personal observation of the person's performance. So I think a case like Block is distinguishable from this case for all of those reasons. We have none of those factors here, Your Honors. So other than Ms. Bohorkas, was there any other coworker or management person that said that Ms. Branscom needed to be replaced? I don't know whether there's anything in the record in those precise words, Your Honor, but other coworkers, Ms. Barry, for example, who was her direct supervisor, also had concerns and expressed concerns about Ms. Branscom's work. So there were at least two people at a supervisory position who had concerns. Ms. Williams, who was not a supervisor but a coworker, by the way, had no experience in the area of being a seamstress. She was, as counsel indicated, a bridal consultant. So the notion that she would be in a position to assess the quality of Ms. Branscom's work versus, for example, Ms. Flores' work really doesn't carry much weight. But I gather she worked at the shop. She being who, Your Honor? Ms. Williams. As a bridal consultant, not as a seamstress. That's correct. Right. But she was there and she could – she must have interfaced or worked with or spoke to or was part of the community of workers. She certainly was. And she testified in her deposition that Ms. Branscom was treated differently. What she said was that her observation was that they looked more closely at Ms. Branscom's dresses. Well, one of the explanations for why might, in fact, be that her performance was poor and they were monitoring it. There's no suggestion – again, Ms. Williams' testimony was she had no reason to believe that any decision made with respect to Ms. Branscom's employment was based on race. And, again, I understand somebody might argue, well, did she really understand the question? But we have two people, Ms. Branscom herself and Ms. Williams, both saying the same thing. And people have an opportunity, of course, to correct after the fact, deposition testimony, if they, in fact, did misunderstand or mishear a question. Those corrections were not made in this case. What about the allegation of age and disability discrimination? Let me start with disability discrimination. As we pointed out in our briefs, the allegation made in the amended complaint was not that Ms. Branscom was regarded as disabled, but that she was actually disabled. For the first time on the motion for summary judgment, Your Honor, she decided to shift to a regarded as claim, with good reason, because the testimony from Ms. Branscom herself, including her EEOC submission and her physician's testimony, both were to the effect this was a temporary condition. There was a benign pituitary tumor. It was removed. She recovered completely. This was not a chronic or enduring condition that adversely affected a major life activity. And, therefore, they shifted to the regarded as. But regarded as, there are several problems with it here, and I'll try to do this quickly because I see my time is up. The first problem is the company didn't regard her as anything. It is not as though the company said, well, gee, this woman who was a full-time employee, she had a pituitary tumor removed. We're going to conclude that because of that, she's no longer capable of working full-time. In fact, Ms. Branscom came back from her 12-week leave, which she wasn't entitled to under FMLA, nor under company policy, but was granted. And when she returned, she said, I can only work part-time. And the company said, okay, work part-time. Turn to the age. The age claim. We have the same actor inference here again, of course, Your Honor. Ms. Miller hired Ms. Branscom when she was 68 and terminated her when she was 69. It's rather we go back to what the Coughlin and Bradley cases both say is that you must muster an extraordinarily strong showing evident from an evidentiary basis to overcome the same actor presumption. One would wonder why Ms. Miller would be willing to hire Ms. Branscom when she was 68, but then think at age 69 she was too old to work. There really is no evidence in the record that there was any such notion in Ms. Miller's mind, and no evidence was brought forth to suggest that that was a motivating factor in the termination. I guess I will stop here unless there are other questions. Thank you, Your Honors. Thank you, counsel. May it please the Court. I'm Monique Wilhite, and I am going to rebut. Get right up to the mic, will you? Keep your voice up. Thank you, Your Honor. I'm Monique Wilhite. I'm going to rebut for plaintiff. First of all, Your Honor, the Court is correct. The same actor would not necessarily apply here because the people who affected Ms. Miller's decision were the people who were trying to, quote, unquote, get rid of Ms. Branscom. We have eyewitness testimony of someone who overheard them say they wanted to get rid of Ms. Branscom, someone who witnessed them doing things to undermine Ms. Branscom's position there at the company, eyewitness who testified that the brides loved Ms. Branscom's work, and that the other seamstress had a dress come back five times before it came out right. So we have a material issue of fact there as to whether their reason for firing her was pretext. And in this particular case, Ms. Miller made all her decisions based on what Alma Cervantes and Claudia Bork has told her. She testified at a deposition. She wasn't there on a daily basis. And also with respect to this Court's question regarding the discrepancies in Ms. Miller's testimony, if the Court looks at the termination notice, the final termination notice, which I believe is on page 345 of the excerpt of records, the three dresses that she's talking about, she saw those dresses on July 27th, and not August 28th. It says clearly in there, she, in her deposition, she said she saw those dresses one time. And first of all, Ms. Branscom was shown three pictures, but they were all, several pictures, they were all of the same dress. So there's an issue as to whether or not she actually saw three dresses. But clearly, there's a confusion as to whether Ms. Miller saw those dresses before July, in July or in August 28th. And that's an issue of material fact there. And one other thing, Your Honor, with respect to the Department of Economic Security records, in that record, on page, volume 4, page 60, it says our records indicate that she voluntarily quit. That means they searched their records, and they reviewed what was it that Ms. Branscom was terminated for, and they said that she voluntarily quit. Apparently, there's an issue of fact as to whether or not the documents that Group USA presented to the Court were in her What's the inference you want us to draw from that? Well, Your Honor, there's a material issue of fact as to why, what was in her personnel file, are these even legitimate documents, were these documents created after the fact? Well, I thought you might say that the inference you'd want us to draw is that there's a, they could have said she was terminated for cause because of poor performance. Correct. And they didn't. That's right. That's exactly right, Your Honor. And so I think that it's important for the district court should have considered that Department of Economic Security document for it generated a genuine issue, another genuine issue of material fact with respect to this case. And so there are several discrepancies with what they have to say as opposed to what Ms. Branscom had to say. They say that she had poor work performance. They offered documents that were supposedly generated from her personnel file that were inadmissible in evidence, that had, there were no, some of the documents, some of the written memos didn't even have the author's name on it or the date. Ms. Branscom in turn submitted affidavits that she did have good work. She had an eyewitness testimony that she had good work. Over the time. Oh, I'm sorry. I'm sorry, Your Honor. I had a time out. That's fine. That's fine. Okay. Thank you so much for your time, Your Honor. Thank you, counsel. We appreciate your arguments. Interesting case. The matter is submitted at this time and that ends our session for this morning. And we'll be in recess until tomorrow.
judges: Hug, Fletcher, Paez